UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Arnelle Mora, | Civil No. 24-cv-4112 (NEB/DJF) |
| Plaintiff, | |
| v. | **ORDER** |
| U.S. Bancorp and U.S. Bank National Association, | |
| Defendants. | |

This matter is before the Court on *Plaintiff's Motion For Conditional Collective Certification And Court-Authorized Notice To Potential Opt-In Plaintiffs Pursuant To 29 U.S.C. § 216(B)* ("Motion") (ECF No. 32). Plaintiff asks the Court for an order to: (1.) conditionally certify her proposed FLSA Collective; (2) require Defendants to identify all proposed FLSA Collective members by providing a list of their names, last known addresses, dates and locations of employment, phone numbers, and email addresses in electronic and importable format within ten (10) days of conditionally certifying the collective; (3) permit her proposed court-authorized notice of this action to be sent to proposed FLSA Collective members via U.S. Mail, email, and text message; (4) appoint Plaintiff's counsel as counsel for the proposed FLSA Collective; and (5) give proposed FLSA Collective members sixty (60) days to join this case, measured from the date the Court-approved Notice is sent, with one reminder email and text message sent thirty (30) days thereafter to anyone who did not respond. (*Id.*) For the reasons given below, the Court certifies Plaintiff's proposed FLSA Collective and otherwise grants Plaintiff's Motion in part.

1

I.      BACKGROUND

   A.      General Background

Defendant U.S. Bancorp is an American multinational financial services firm headquartered in Minneapolis, Minnesota. (ECF No. 38 at ¶ 4.) It is the parent company of its primary operating entity, Defendant U.S. Bank National Association, which does business as "U.S. Bank." (*Id.* ¶¶ 4, 6.) U.S. Bank has six divisions—or business lines—further divided into 66 subordinate business organizations and 344 separate cost centers. (*Id.* ¶ 12.) Each business line has managers unique to that line, and each subordinate organization has its own managers, whose employees perform different functions. (*Id.*) As of January 2025, U.S. Bank's business lines employed 10,192 employees in 49 states and Washington D.C., a majority of whom could be considered "call center employees." (*Id.*)

On November 4, 2024, Plaintiff Arnelle Mora initiated a putative collective and class action on behalf of herself and other similarly situated individuals who have worked for Defendants as call center agents or similar positions ("Customer Service Representatives" or "CSRs") who were compensated on an hourly basis ("Complaint") (ECF No. 1 at ¶ 2). Plaintiff alleges Defendants' systemic failure to compensate its CSRs for all hours worked, including overtime hours at the appropriate overtime rate, is a willful violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq., and common law. (ECF No. 1 at ¶ 1.)

Plaintiff alleges that Defendants maintain a common policy and practice of depriving CSRs of all hours worked by training or instructing them to load and log onto their computers before clocking into Defendants' timekeeping system. (*See, e.g., id.* ¶¶ 2, 3, 7, 36, 37, 39 50-53.) Plaintiff claims that, despite knowing CSRs performed pre-shift work, Defendants and their managers made no effort to prevent or disallow it from happening and deprived CSRs of compensation for their

2

off-the-clock work. (*See e.g.*, *id.* ¶¶ 41, 57, 62, 70.) Plaintiff alleges pre-shift work for most CSRs typically ranged from at least 10-15 minutes on any given day. (*Id.* ¶ 52.)

B.     **Factual Background Related to Proposed Collective**

Pursuant to 29 U.S.C. § 216(b), Plaintiff seeks conditional certification of her FLSA claims on behalf of the following proposed collective:

> *All current and former hourly call center employees who worked for Defendants at any time in the past three years* (the "FLSA Collective").

In addition to Plaintiff Mora, there are currently four Opt-in Plaintiffs: Ryan Ford (ECF No. 6-1 at 2); Karolin Kirst (ECF No. 24-1 at 2); Aneesa Gray (*id.* at 3); and Davion Guthrie (ECF No. 31-1 at 2)—each an allegedly similarly-situated CSR. Plaintiff's Motion is supported by declarations from four of them ("Supporting Declarations") (ECF Nos. 33-5, 33-6, 33-7, 33-8):

- Named Plaintiff Arnelle Mora, Customer Experience Specialist, worked remotely from her Texas home from about January 2023 to April 2024 and was paid an hourly wage, most recently $23.51 (ECF No. 33-5 at ¶¶ 2-3).

- Opt-in Plaintiff Ryan Ford, Collector, worked remotely from his home in Texas from about February 2024 to November 2024 and was paid an hourly wage, most recently at $20.00 (ECF No. 33-6 at ¶¶ 2-3).

- Opt-in Plaintiff Aneesa Gray, Collector II, worked in Defendants' Collinsville, Illinois brick-and-mortar call center from about 2008 to 2020, then remotely from her home from about 2020 to the present, and was paid an hourly wage, most recently at $20.00 (ECF No. 33-7 at ¶¶ 2-3).

- Opt-in Plaintiff Davion Guthrie, Collector, worked remotely from his home in Missouri from February 2022 to June 2024 and was paid an hourly wage, most recently at $20.00 (ECF No. 33-8 at ¶¶ 2-3).

According to the Supporting Declarations, despite their various job titles, all the CSRs: (1.) were paid by the hour; (2.) were classified as non-exempt employees; (3.) regularly worked forty or more hours per workweek; (4) relied on a computer and essential computer programs to perform their job duties daily; (5.) were subject to Defendants' same relevant policies; and (6.) were required to perform work off-the-clock before their scheduled shifts began, when they were not

3

logged into Defendants' timekeeping system. (*See* ECF Nos. 33-5 ¶¶ 3-23; 33-6 ¶¶ 3-24; 33-7 ¶¶ 3-23; 33-8 ¶¶ 3-24.) Each Supporting Declaration also states that "[t]o the extent Defendants may have written policies that required their employees to be paid for all hours worked, including overtime, the reality is that Defendants did not follow these policies," which resulted in CSRs not being paid for all hours worked. (ECF Nos. 33-5, 33-3 ¶ 20; ECF Nos. 33-6, 33-8 ¶ 21.) Finally, Plaintiff provided job descriptions from Defendants' website for various CSR positions, reflecting similar job duties and requirements, including using a computer ("Job Descriptions") (ECF Nos. 33-9, Account Services Representative-Minnesota; 33-10, Wire Transfer Customer Service Specialist-Oregon; 33-11, Call Center Collector-remote).

In opposition to Plaintiff's Motion, Defendants filed several declarations of their own ("Opposing Declarations") (ECF Nos. 38-43). Defendants' Opposing Declarations largely contest Plaintiff's factual allegations and assert that each CSR was properly trained on Defendants' timekeeping policies—including policies providing that they should manually enter their start times based on when they turn on their computers, accurately record when they start and stop for meal breaks, and end their days based on when they close out all programs. (ECF Nos. 38 ¶¶ 20-28; 39 ¶¶ 7-13; 27-42; 41 ¶¶ 13-35; 42 ¶¶ 12-44; 43 ¶¶ 14-39; 5-43.)

In relevant part, Defendants' Time and Pay Policy for CSRs provides the following instructions:

> Employees record time in Workday.
> …
> All non-exempt employees are expected to accurately report their In and Out time(s) and Out Reason(s) on their timecard in Workday. These actions must be done to ensure payment of correct wages.
> …
> Non-exempt employees are strictly prohibited from performing work of any kind 'off the clock,' no matter how minimal, as it is the company's policy to pay for all time worked.

4

("Time and Pay Policy") (ECF No. 38-1 at 3).  Defendants contend that they train all non-exempt CSRs on company policies and procedures upon hiring them and provide additional, job-specific training to employees in the various business lines regarding their Time and Pay Policy.  (ECF No. 38 ¶¶ 24-25; ECF No. 39 ¶¶ 7-11; ECF No. 41 ¶ 13; ECF No. 42 ¶¶ 12-14; ECF No. 43 ¶¶ 24-25.)  Defendants similarly provide training on their CSC NA Timecard and Payroll Expectations (Non-Exempt Employees) Policy ("Employee Payroll Expectations Policy") (ECF No. 38-1 at 10), which states, "All time spent logging into systems must be paid and accurately reflected in your timecard."

Defendants also submitted a policy stating its expectations for managers related to reviewing and approving employee timecards.  (ECF No. 38-1 at 13-16, CSC NA Timecard and Payroll Expectations (Managers) ("Manager Payroll Expectations Policy").)  This policy provides:

> An employee's start time includes any time the employee spends turning on their computer and going through the startup and login process.  There could be additional time needed for an employee's computer to boot up as they prepare to log in to the phone system.

(ECF No. 38-1 at 14.)  The policy further directs, "Our employees should enter the time they start booting up their computer as the IN punch." (*Id*. at 15.)  The record is unclear as to what extent the Manager Payroll Expectations Policy is communicated to CSRs.

Though Defendants' policies require employees to accurately enter their time, they also threaten to discipline employees who record overtime work that is not preapproved, and demand that employees complete any start-up tasks necessary to perform their jobs—such as booting up their computers and logging into applications needed to perform their duties—in five minutes or less:

> Employees should obtain approval from their manager before working in excess of 40 hours in a week or adjusting their normal work schedule.  Failure to obtain the proper approvals may result in corrective action being taken.  However, time

5

> must be recorded accurately (as it actually happened) and should not be altered or falsified in any way, such as to avoid overtime that was not preapproved.
>
> …
>
> Although you'll be paid for the overtime you work, you shouldn't work overtime without advance approval from your manager. If you don't obtain advance approval, you may face disciplinary action, up to and including termination of employment.

(Time and Pay Policy, 38-1 at 3, 5.)

> [Defendants'] staffing and service level forecasting is based on employees going into production at their scheduled shifts. You must log in and be ready to adhere to your scheduled start and end times. … If your business line requires you to be ready to enter production at the start of your shift, you must log into Windows/Active Directory and be ready to handle calls, or be in production, *within five minutes* of your shift start time.

(Employee Payroll Expectations Policy, 38-1 at 10, emphasis added.) Defendants' Employee Payroll Expectations Policy further directs employees to "Log your 'Start' time daily in Workday immediately *after* you log into Windows/Active Directory." (*Id.* at 10.)

In rebuttal, Plaintiff provided supplemental declarations from herself and Opt-in Plaintiffs Ford and Gray ("Supplemental Declarations") (ECF Nos. 50-3, 50-4, 50-5). The Supplemental Declarations acknowledge that during their time as CSRs, Plaintiff Mora and Opt-in Plaintiffs Ford and Gray each used a manual time-keeping system to track their hours, such that it was possible for them to enter their actual start times in the system. But they assert they were not trained to "clock in" when they started their computers and were specifically instructed by their various supervisors to exclude the time it took them to boot-up their computers when logging their "clock in" time. (ECF Nos. 50-2 ¶¶ 3-5, 50-3 ¶¶ 2-5, 50-4 ¶¶ 3-5.) Plaintiff Mora also asserts that Defendants' policy was to mark CSRs "absent" if they were not "call ready" within five minutes of their shift start time as instructed. (ECF No. 50-3 at 3.) She further asserts that the pre-shift boot-up process exceeded five minutes "every shift". As a result, she had to "turn on/warm up [her] computer before the start of [her] scheduled shift" so she could be "call ready" at the required

6

time. (*Id.*) She states that when this happened, she would manually enter her scheduled shift start time as her clock-in time, to avoid reporting more than 40 hours in a week without preapproval and receiving discipline for running afoul of Defendants' overtime policy. (*Id.*)

## II.     Legal Standard

Under the FLSA, "any one or more employees" may bring a collective action against an employer for unpaid overtime. 29 U.S.C. § 216(b). Unlike a class action class member under Federal Rule of Civil Procedure 23, no person becomes a party to a collective action unless "he gives his consent in writing to become such a party and such consent is filed in the court in which [the] action is brought." *Smith v. Heartland Auto. Servs., Inc.*, 404 F. Supp. 2d 1144, 1149 (D. Minn. 2005) (quoting Section 216(b)). "Courts have discretion, in appropriate cases, to facilitate the opt-in process by conditionally certifying a class and authorizing court-supervised notice to potential opt-in plaintiffs." *Chin v. Tile Shop, LLC*, 57 F. Supp. 3d 1075, 1082 (D. Minn. 2014) (cleaned up).

"Courts in this District have adopted a two-step process to determine whether a collective should be certified under the FLSA." *Hagen et al. v. Meridian Servs., Inc., et al.*, Case No. 24-cv-3661 (PAM/DTS), 2025 WL 1068050, at *2 (D. Minn. Mar 21, 2025) (citing *Yan Ming Wang v. Jessy Corp.*, No. 17-cv-5069 (JRT/HB), 2018 WL 5617567, at *2 (D. Minn. Oct. 30, 2018)). "First, the court determines whether the class should be conditionally certified for notification and discovery purposes." *Chin*, 1082 (D. Minn. 2014) (citing *Burch v. Qwest Commc'ns Int'l, Inc.*, 500 F. Supp. 2d 1181, 1186 (D. Minn. 2007)). "Determination of class status at the notice stage is granted liberally because the court has minimal evidence for analyzing the class." *Id.* (citing *Ray v. Motel 6 Operating, Ltd. P'ship*, No. 3-95-828 (RHK), 1996 WL 938231, at *2 (D. Minn. Mar. 18, 1996)). "The plaintiffs need only establish at that time a colorable basis

for their claim that the putative class members were the victims of a single decision, policy, or plan."[1] *Id.* (citing *Burch*, 500 F. Supp. 2d at 1186). If the parties present contradictory evidence, the Court does not make credibility determinations or find facts at this stage. *Chin*, 57 F. Supp. 3d at 1083 (citing *Brennan*, 2008 WL 819773, at *3). "[C]ourts usually rely on the pleadings and any affidavits submitted by the plaintiff to determine whether to grant conditional certification." *Id.* at 1082-83 (citing *Parker v. Rowland Express, Inc.*, 492 F. Supp. 2d 1159, 1164 (D. Minn. 2007)).

The plaintiff bears the burden of showing members of the collective are similarly situated, but the "burden at the first stage is a light one." *Vallone v. CJS Sols. Grp., LLC*, 437 F. Supp. 3d 687, 689 (D. Minn. 2020) (citing *Smith*, 404 F. Supp. 2d at 1149). "Plaintiffs may be similarly situated when they suffer from a single, FLSA–violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs." *Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791, 796 (8th Cir. 2014), *aff'd*, 136 S.Ct. 1036, 194 L.Ed.2d 124 (2016). Courts may consider the following factors: "'(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations.'" *Id.* (quoting *Thiessen v. Gen. Elec. Cap. Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001)). Although the named plaintiff bears the burden of establishing that all plaintiffs are similarly situated, "[that]

---

[1] Defendants argue the United States Supreme Court's recent decision in *E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 49–52 (2025), rejects the "lenient" standard courts in this District typically apply and requires plaintiffs to show they are similarly situated by a "preponderance of the evidence." (ECF No. 37 at 7 n.4.) That case is inapposite. In *EMD Sales*, the Court held that a preponderance-of-the-evidence standard applies (as opposed to a clear-and-convincing-evidence standard) when an employer seeks to show that an employee is exempt from the minimum-wage and overtime-pay provisions of the FLSA. 604 U.S. at 49–52. *EMD Sales* addressed the *employer's* burden of proof *at trial* to show than an exemption from the FLSA applies. The Court declines Defendants' unsupported invitation to stretch the Court's holding in *EMD Sales* to apply to the *employees'* burden at the early conditional certification stage of a collective action.

burden is not so rigorous that [the named plaintiff] must demonstrate [her] position[] [is] identical to those of the opt-in plaintiffs." *Nerland v. Caribou Coffee Co., Inc.*, 564 F. Supp. 2d 1010, 1018 (D. Minn. 2007). "Rather, plaintiffs 'need show only that their positions are similar.'" *Id.* (quoting *Smith*, 404 F. Supp. 2d at 1149).

Though the bar is low, a court cannot simply rubber-stamp a plaintiff's request for collective certification. To establish a "colorable basis", the plaintiff must "come forward with something more than the mere averments in [her] complaint in support of [her] claim." *Johnson v. N. Mem'l Health Care*, 2024 WL 4904965, at *4 (D. Minn. Jan. 5, 2024) (quoting *West v. Border Foods, Inc.*, 2006 WL 1892527, at *3 (D. Minn. July 10, 2006)). This standard requires a plaintiff to establish a "factual basis" that would allow a Court to "determine if similarly situated potential plaintiffs exist." *Id*. (quoting *Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870, 892 (N.D. Iowa 2008)). And "the mere fact that some employees of a large corporation were not properly compensated under the FLSA does not provide a 'colorable basis' to infer the existence of an unlawful companywide policy." *Saleen v. Waste Mgmt., Inc.*, 649 F. Supp. 2d 937, 941 (D. Minn. 2009). Several courts have found that plaintiffs satisfy their burden by submitting evidence—in the form of affidavits or declarations—that establish a potential FLSA violation. *See, e.g.*, *Chin*, 57 F. Supp. 3d at 1083 (finding employee declarations submitted provided a colorable basis to grant conditional certification); *Shoots*, Civ. No. 15-563 (SRN/SER), 2015 WL 6150862, at *18 (D. Minn. Oct. 19, 2015) (same); *Harris v. Chipotle Mexican Grill, Inc.*, 49 F. Supp. 3d 564, 577 (D. Minn. 2014) (same).

At the conditional certification stage, a plaintiff must also "demonstrate some interest from others who are similarly situated." *Chin*, 57 F. Supp. 3d at 1090. "[I]n order for a case to be appropriate for collective-action status under the FLSA, the Court must be satisfied that there are

9

other employees who desire to opt in." *Id.* (quoting *Lyons v. Ameriprise Fin., Inc.*, No. 10-cv-503 (RHK/JJK), 2010 WL 3733565, at *4 (D. Minn. Sept. 20, 2010)). A "plaintiff's burden to demonstrate interest is not particularly onerous." *Chin*, 57 F. Supp. 3d at 1091. Though the plaintiff "is not entitled to conditional certification simply to seek out others who might wish to join the action," *Parker,* 492 F. Supp. 2d at 1166, "the existence of more than one or two plaintiffs in a FLSA case at the time of the conditional-certification inquiry has been found sufficient to warrant collective-action treatment, even without a showing that other individuals wish to opt-in." *Chin*, 57 F. Supp. 3d at 1091 (internal quotation marks and citation omitted).

"If certification is granted, and once discovery has progressed, the party opposing the class action may move to decertify the class." *Shoots v. iQor Holdings U.S. Inc*., 325 F.R.D. 253, 270 (D. Minn. 2018). "'If a class is decertified, opt-in class members are dismissed without prejudice, and the case proceeds only in the putative class representatives' individual capacities.'" *Id.* (quoting *Keef v. M.A. Mortenson Co.*, No. 07-CV-3915 (JMR/FLN), 2008 WL 3166302, at *2 (D. Minn. Aug. 4, 2008)). "At this stage, a court will again analyze whether the plaintiffs are similarly situated to the proposed FLSA class." *Id.*

### III.  Analysis

#### A.  Conditional Certification

##### 1. Similarly Situated Members

Plaintiff argues she has met her burden to establish that the prospective members of the FLSA Collective—the CSRs—are similarly situated. She argues that her detailed Complaint and supporting evidence present at least a colorable basis that CSRs have similar job requirements and are subject to the same unlawful company-wide policies and practices that cause them to perform

uncompensated pre- and post-shift work. The Court agrees she has done enough to carry her relatively limited burden at this early stage in the litigation.

Plaintiff's Supporting and Supplemental Declarations, based on current and past employees' knowledge, establish that prospective class members—regardless of job title and job location—are similarly classified as non-exempt hourly workers who require a computer to perform their job duties, and who may perform uncompensated pre- and post-shift work because of Defendants' time-keeping system and written policies. (ECF Nos. 33-5 ¶¶3-23; 33-6 ¶¶3-24; 33-7 ¶¶3-23; 33-8 ¶¶3-24; 50-2 ¶¶ 3-5, 50-3 ¶¶ 2-5, 50-4 ¶¶ 3-5.) Plaintiff's Complaint and supporting exhibits are enough to establish at least a colorable basis that they are similarly situated. *Chin*, 57 F. Supp. 3d at 1083 (D. Minn. 2014) (conditionally certifying a nationwide employee class after finding the similarly situated inquiry satisfied when plaintiff submitted employee declarations and exhibits that provided a colorable basis to show uniformity of job duties and a common injury through a common pay policy).

The Court does not find any of Defendants' arguments to the contrary availing. Defendants claim that instead of identifying a common policy that causes employees to work off the clock Plaintiff simply recycled her brief and declarations from other cases (*id.* at 7-8). They contend that Plaintiff's allegations: (1.) are not specific to *this* case; and (2.) do not accurately describe Defendants' timekeeping policies or how employees were trained on those policies (*id.* at 9-15). But Plaintiff's Supplemental Declarations address the manual timekeeping system at issue in this case as well as the specific policies Defendants proffered in opposition to the Motion. Plaintiff alleges that: (1.) she and the Opt-In Plaintiffs were all required to use the same manual timekeeping system that they could not access until after they spent time waking up their computers, waiting for the computers to turn on, and logging into Defendants' network (ECF Nos. 33-5 ¶ 13; 33-7

11

¶ 13; 33-6 ¶ 14; 33-8 ¶ 14; 50-3 ¶ 4; 50-4 ¶ 5; 50-5 ¶ 4); (2.) Defendants' Employee Payroll Expectations Policy directs CSRs to clock in (enter their start times) after they start up their computers and log in (ECF No. 38-1 at 10); (3.) Defendants' Employee Payroll Expectations policy also requires CSRs to complete the start-up process and be ready to handle calls within five minutes of their shift start times (*id.*); (4.) the time it takes to complete the start-up process exceeds five minutes (ECF No. 50-3 ¶ 6; ECF No. 50-5 ¶ 6); (5.) to comply with Defendants' five-minute "call ready" requirement, CSRs routinely start their shifts before their scheduled start times (ECF No. 50-3 ¶¶ 4-6; ECF No. 50-4 ¶ 5; ECF No. 50-5 ¶¶ 4-6); and (6.) Defendants' Time and Pay Policy requires CSRs to log their time accurately, but also threatens termination for failure to seek prior approval before logging overtime work (ECF No. 38-1 at 3-5). Whether similar declarations support allegations in other lawsuits does not negate the fact that Plaintiff's Supporting and Supplemental Declarations support the allegations in *this* case. Moreover, Plaintiff points to the specific policies that Defendants acknowledge apply as additional support for her claims. This is enough for conditional certification.

Defendants also improperly ask the Court to weigh the merits of Plaintiff's FLSA claims and make credibility determinations in light of counter evidence. (ECF No. 37 at 15-17.) Defendants argue their Opposing Declarations and evidence clearly show that Plaintiff's allegations fail and urge the Court not to "bury its head in the sand" by blindly accepting Plaintiff's allegations as true. (*Id.*) But the Court must not find facts or make credibility determinations at this stage in the proceedings. *Chin*, 57 F. Supp. 3d at 1083 (citing *Brennan*, 2008 WL 819773, at *3). After discovery, the evidence may establish that a collective action is improper, but Plaintiff's burden at *this* stage is only to show something more than mere averments in support of her collective claim. *Johnson*, 2024 WL 4904965, at *4. The Court finds that she has done so.

Finally, Defendants maintain that "[b]ecause [the] timekeeping policy compensates employees for all time worked, Plaintiffs must show that there is a companywide practice to violate this policy." (ECF No. 37 at 17-33.) Defendants argue that: (1.) Plaintiff's declarations are insufficient to establish any companywide policy that fails to compensate employees for all time worked (*id.* at 18-25); (2.) Plaintiff's other purported experiences—including her allegations that it can take anywhere from ten to twenty minutes to perform pre-shift work, and CSRs who violate Defendants' policies are subject to discipline—are unique and not widespread (*id.* at 25-30); and (3.) without evidence of a single decision, policy, or plan that led to unpaid work, conditional certification is improper (*id.* at 30-33). Defendants argue Plaintiff's "meager, conclusory evidence from four individuals out of over 10,000-plus (and who worked in only two of six relevant business lines) does not establish a 'colorable basis' that U.S. Bank implemented an across-the-board practice to violate its own policies." (*Id.* at 30.) Rather, Defendants argue that, at most, Plaintiff's evidence shows that "a handful of 'rogue' managers' may be to blame for any of her or Opt-In Plaintiffs' uncompensated work. (*Id.* at 31-32.)

But Plaintiff has pointed to specific written companywide policies to support her allegations, including Defendants' Employee Payroll Expectations Policy that directs CSRs to log their time after starting their computers and be "call ready" within five minutes (ECF No. 38-1 at 10), and Defendants' Time and Pay Policy that requires CSRs to log their time accurately, but threatens termination for failure to seek prior approval before logging overtime work (ECF No. 38-1 at 3-5). Taken together, these policies assume CSRs will need no more than five minutes of time to complete the start-up process. Otherwise, they are faced with a Hobson's choice: either start work early and exclude pre-shift work in recording their start times; or record actual pre-shift start times and risk discipline for incurring unapproved overtime. Moreover, Plaintiff's detailed

13

Supporting and Supplemental Declarations, based on current and past CSRs' personal experience, explain how Defendants' policies and manual timekeeping system allegedly caused them to perform uncompensated overtime work. *See, e.g.*, *Chin*, 57 F. Supp. 3d at 1083 (finding employee declarations submitted provided a colorable basis to grant conditional certification); *Shoots*, Civ. No. 15-563 (SRN/SER), 2015 WL 6150862, at *18 (D. Minn. Oct. 19, 2015) (same); *Harris v. Chipotle Mexican Grill, Inc.*, 49 F. Supp. 3d 564, 577 (D. Minn. 2014) (same).

Defendants argue, "Plaintiffs' allegation that employees routinely spend 20 minutes starting up their computers, connecting to the VPN, and opening their programs is not only facially implausible, but also not supported by the record." (ECF No. 37 at 31, citing Defendants' Opposing Declarations.) But Plaintiff rebutted this claim by introducing her Supplemental Declarations into the record. And though Defendants' claim ultimately may prove to be correct, the parties' dispute regarding the amount of time it takes CSRs to boot up their computers and log in is the kind of fact discrepancy the Court cannot resolve at the conditional certification stage. Indeed, much of Defendants' argument asks the Court to rely on Defendants' own contradictory evidence which, as previously stated, is improper.

The Court appreciates the fact that Defendants' companywide policies explicitly prohibited off-the-clock work, but Plaintiff has made at least a colorable claim that those same policies, when taken together, created inconsistent incentives to write off pre-shift work, and proffered declarations stating that this is what actually happened in practice. The Court thus concludes that Plaintiff has met the standard for conditional certification at this stage in the proceedings.

### 2. Sufficient Interest

The Court also finds that Plaintiff has adequately demonstrated sufficient interest in the prospective FLSA collective action. "There is no bright line rule about how many interested

persons—named plaintiffs and opt-in plaintiffs—must be identified to satisfy this requirement." *Hagen*, 2025 WL 1068050, at *4 (citing *Deutsch v. My Pillow, Inc.*, No. 20-cv-318 (SRN/ECW), 2020 WL 7351556, at *10 (D. Minn. Dec. 15, 2020). But "[c]ourts in this District have generally found one or two interested persons insufficient." *Id.* (citing *Deutsch*, 2020 WL 7351556, at *10) (collecting cases). Courts also "consider the percentage of known interest among the whole potential class." *Deutsch*, 2020 WL 7351556, at *10. But "there is no numerical baseline that plaintiffs must meet," and "whether a plaintiff has shown sufficient opt-in interest is necessarily a case-specific inquiry that will turn on case-specific facts." *Wang v. Jessy Corp.*, 2019 WL 3574553, at *5 (D. Minn. Aug. 6, 2019).

Defendants contend that Plaintiff fails to show sufficient interest in this litigation. (ECF No. 37 at 34-37.) But the prospective FLSA Collective has one named Plaintiff (*see* ECF No. 1 at 1; ECF No. 1-1 at 1), and four Opt-In Plaintiffs (ECF Nos. 6-1 at 2; 24-1 at 2; 24-1 at 3;31-1 at 2). Though more opt-in plaintiffs would establish a stronger case, the Court finds that five interested persons is enough to demonstrate adequate interest. *Deutsch*, 2020 WL 7351556, at *10 (finding three interested persons sufficient, but a "close call").

Defendants also argue that because three of the four Supporting Declarations are from CSRs who worked in its Collections organization, any potential collective action should be limited to its Collections organization. (ECF No. 37 at 35-36.) Defendants point out that U.S. Bank has six different business lines, further divided into 66 business organizations—comprising approximately 10,000 employees at any given time—and that Plaintiff offers just four total declarations from only two of its business lines. (*Id.* at 34.) But Defendants also concede that its policies and procedures govern *all* non-exempt employees (ECF No. 38-1 at 8-11), and there are other examples of nationwide collectives across the country certified on showings like those here.

15

*See, e.g., Preston v. World Travel Holdings, Inc.,* 2024 WL 519548 (D. Mass. Feb. 9, 2024) (large putative member collective action certified with two plaintiff declarants); *Padan v. West Bus. Solutions, LLC*, 2016 WL 304303 (D. Nev. Jan. 25, 2016) (large putative member collective action certified with three declarants). Because Plaintiff has proffered sufficient interest in the litigation, the Court will conditionally certify an FLSA collective. And because Defendants articulate no basis to believe their policies and procedures apply differently to different business lines, the Court declines to limit the FLSA collective to any particular business line. The FLSA collective is defined as: *All current and former hourly call center employees who worked for Defendants at any time in the past three years* ("FLSA Collective").

**B.     Notice**

The Supreme Court has interpreted Section 216(b) as granting courts authority to manage the process for providing notice of a collection action. *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989). Plaintiff asks the Court to authorize her proposed notice form ("Notice and Consent") (ECF No. 33-3) and text message (ECF No. 33-4) with the following parameters for distribution and participation: (1.) Defendants must identify all putative collective members by producing a list of their names, last known addresses, dates and location of employment, phone numbers and email addresses, in electronic and importable format, within ten (10) days of an order conditionally certifying the collective; (2.) Plaintiffs may send the court-authorized notice via U.S. Mail, email, and text message; and (3.) putative collective members have sixty (60) days to join the case, measured from the date the court-authorized Notice is sent, with one reminder email and text message sent thirty (30) days thereafter to anyone who did not respond. (ECF No. 32 at 1-2.) Plaintiff also asks the Court to appoint her attorneys as counsel for the conditionally-certified FLSA Collective. (*Id.* at 1.)

16

Defendants do not appear to object to the substance of Plaintiff's proposed Notice and Consent or the appointment of Plaintiff's attorneys as counsel for the FLSA Collective. (ECF No. 37 at 36-38.) However, Defendants object to the use of text messaging or work email to distribute the Notice and Consent. (*Id.*) Defendants assert that "sending the notice via U.S. mail and personal email, with a reminder sent by U.S. mail, is much more appropriate." (ECF No. 37 at 36.) The Court agrees that notice via text message is intrusive and unnecessary, and thus will not require Defendants to provide telephone numbers. *Chapman v. Elec. Builders, Inc*., Civ. No. 20-1087 (PJS/LIB), 2020 WL 12814165, at *9 (D. Minn. Oct. 15, 2020) (citing *Maseck v. TAK Commc'ns, Inc.*, No. Civ. No. 10-965 (JRT/AJB), 2011 WL 1190579, at *8 (D. Minn. Mar. 28, 2011) ("Notice via text message and/or telephone is not necessary.")). But the Court finds that authorizing notice through both work and personal email is appropriate. *See, e.g.*, *Deutsch,* 2020 WL 7351556, at *14 (ordering defendant to produce "last known personal and work email addresses" of potential class members); *Chapman v. Elec. Builders, Inc*., Civ. No. 20-1087 (PJS/LIB), 2020 WL 12814165, at *9 (D. Minn. Oct. 15, 2020) (requiring defendant to provide "email addresses (both personal or work, if available) ….").

Having reviewed the Notice and Consent, and finding no issue with its substance, the Court authorizes its distribution to the FLSA Collective through U.S. Mail, personal email and work email. Putative members shall have sixty (60) days to join the collective action, measured from the date the Court-approved Notice is sent, with one reminder email sent thirty (30) days thereafter to anyone who did not respond. Defendants must identify all putative collective members by providing a list of their names, last known addresses, dates and location of employment, and all known email addresses in electronic and importable format by July 10, 2025. The Court also appoints Plaintiff's counsel as counsel for the FLSA Collective.

**ORDER**

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT** Plaintiff's Motion For Conditional Collective Certification And Court-Authorized Notice To Potential Opt-In Plaintiffs Pursuant To 29 U.S.C. § 216(B) (ECF No. 32) is **GRANTED IN PART AND DENIED IN PART AS FOLLOWS**:

1. This matter is conditionally certified as a collective action defined as follows:

   *All current and former hourly call center employees who worked for Defendants at any time in the past three year*s.

2. On or before July 10, 2025, Defendants shall produce a list to Plaintiff's counsel with the following information for each putative collective member, in an electronic and importable format: (1.) name; (2.) last known address; (3.) dates and location of employment; and (4.) all known personal and work email addresses.

3. Plaintiff's proposed Notice and Consent Form (ECF No. 33-3) is **APPROVED**.

4. Plaintiff's counsel is authorized to distribute the Notice and Consent Form to each putative class member via U.S. mail and email only.

5. Each putative collective member shall have sixty (60) days to either submit (if electronic) or postmark (if mail) a consent form to join this action; and

6. Plaintiff's counsel is further authorized to distribute a reminder notice at the 30-day mark of the notice period to each putative collective member who did not already respond.

7. The Court appoints Kevin J. Stoops and Thomas V. Nafziger as counsel for the collective action.

Dated: June 30, 2025					*s/ Dulce J. Foster*
						DULCE J. FOSTER
						United States Magistrate Judge